JOSEPH L. YEOMANS, PETITIONER-RESPONDENT, v. CITY OF JERSEY CITY, RESPONDENT-APPELLANT.

Argued June 3, 1958—Decided June 27, 1958.

498

*Mr. Robert C. Gruhin* argued the cause for the petitioner-respondent (*Mr. Walter E. McInerney,* attorney).

*Mr. Meyer Pesin* argued the cause for the respondent-appellant (*Mr. Ezra L. Nolan,* attorney).

The opinion of the court was delivered by

PROCTOR, J. This is an appeal by an employer from an award for increased disability in a workmen's compensation proceeding, which was affirmed by the Hudson County Court and the Appellate Division. The employer appeals as a matter of right bcause of a dissent filed in the latter court.

On October 3, 1952 the petitioner, 41 years of age, was employed by Jersey City as an ambulance driver for the Medical Center, a municipally-owned hospital. On that date, he helped to carry a heavy male stretcher patient, who had mortally wounded himself in his apartment, down a narrow, twisting, three-flight stairway. While attempting to negotiate the stairs and the turns on the stair landings with the heavily ladened stretcher, the petitioner was required to lift and pull it while in an awkward position, and while doing so started getting pains through the back and chest. Despite

the pain, petitioner continued to assist in carrying the stretcher and drove the patient to the hospital. After reporting to his superior, the petitioner complained of the pain and was sent to the emergency room "to be checked." He was examined the same day by a hospital interne, who sent the petitioner home after giving him "nitroglycerine pills." The following day he returned to the hospital and an electrocardiogram was taken under the supervision of Dr. Nathan Frank, a specialist in diseases of the heart and circulatory system. After a reading of the electrocardiogram, the following entry was made on the petitioner's record: "Rule out coronary occlusion, chronic hepatic disease," and petitioner was accordingly advised to enter the hospital. On October 6, 1952 petitioner was hospitalized. He complained to Dr. Frank that he had pain over the left chest, with pain running down his left arm. He remained in the hospital until October 22, 1952. During that period he was given a series of clinical tests, including two additional electrocardiograms. All of these tests were negative for heart disease. Dr. Frank's diagnosis was that the petitioner had sustained a strain of the upper back. After his discharge from the hospital, petitioner was examined by Dr. Frank at his private office on October 27, 1952 and on February 11, 1953. These examinations were a follow-up to petitioner's hospital admission, in the nature of a "check-up." No further tests were conducted on these visits and the only medication prescribed was "a mild nerve sedative." Following petitioner's release from the hospital on October 22, 1952, Dr. Frank advised him not to do any heavy work for a year or more and ordered that the petitioner be given only light duty at the hospital. Petitioner was hospitalized again between January 21 and January 31, 1953, and from April 13 to April 16, 1953. The ambulance surgeon's report on the January admission stated a provisional diagnosis of "Coronary." The petitioner on this occasion stated that the "pain was real terrific" and "shooting down the arm." The provisional diagnosis for the April admission was "severe back pain—known cardiac—chest pain—cyanosis."

Following his discharge from the hospital in April 1953 petitioner continued to perform only light duty until early in February 1954, when he was assigned to work in "central supply." This assignment required that the petitioner perform "heavy work," which consisted of pushing a supply truck approximately eight feet long and four feet high. Petitioner was able to perform this work for only a day and a half, when his "back gave in." On February 4, 1954 petitioner was again hospitalized. Dr. Frank was called to examine him, but after stating "It is not your heart, it is your back this time," referred him to a Dr. Costello, who began to treat the petitioner for his back and for hemorrhoids. Dr. Costello told him that he could no longer do any heavy work. Petitioner left his employment by the hospital on February 4, 1954, due to his inability to perform the heavy work assigned to him just prior to that date. He later reported back for work, but was refused light duty. He has not been employed by the city since that time.

Petitioner filed his initial claim for workmen's compensation on April 30, 1954. His petition in that proceeding recited the history of the stairway incident of October 3, 1952 and stated that the petitioner injured his "back, chest, stomach and right arm." At the hearing in October 1954 petitioner testified that he "got pain through the back" and "at times I get the chest pains." He testified: "I can't do no heavy work. All I can do is light work * * * on account of the back"; that he didn't attempt to do any heavy work "because the doctor told me not to." A Dr. Marcus, who first examined the petitioner on April 26, 1954, testified that the petitioner's disability was the result of "residual effects of a sprain of the musculature of the left anterior chest and left upper abdomen" and "strain of the lower back involving the lumbosacral region" which was causally related to the 1952 accident. He also stated there "might be a medical disability which is probably cardiorespiratory in nature and which is unrelated." The city's medical witness made substantially the same findings.

The Deputy Director found that the petitioner had sustained an "orthopedic permanent disability causally related to the accidental injury" and that "it appears that the petitioner was suffering from preexisting conditions, which may or may not be considered or classified as conditions of permanent disability, and it further appears that the trauma resulted in orthopedic permanent disability superimposed upon the previous conditions." An award of 12½% partial permanent disability was made.

In September 1955 the petitioner filed his present petition for increased disability arising out of the October 1952 incident. At the hearing in March 1956 the petitioner testified as to the manner in which he was injured in October 1952 and further testified that he had been hospitalized for a heart condition in November 1954, December 1954, July 1955, October 1955 and January 1956; that in November 1954 he had "pains through the chest and my back and all, and the pains running down the arm. I have that continuously at times and, at times, when that gets very bad, I just got to call a doctor in on it." He also testified that at the present time "I just lay home all the time with the heart up getting these pains into the chest and the pains running down into my left arm"; that he never had any trouble with his heart prior to October 3, 1952, and that his present doctor "told me I can't work no more." On cross-examination, he stated that he had tried to work since February 1954, but was turned down because his prospective employer "found out just what the score was on to it." The petitioner's only medical witness was Dr. Charles L. Cunniff, a specialist in internal medicine, a field which also includes "heart specialty." He first examined the petitioner in November 1954, when he was called in consultation by Dr. Costello to determine whether it would be feasible to perform a hemorrhoidectomy upon the petitioner in light of his heart condition. From that time on the petitioner became Dr. Cunniff's patient for the treatment of his cardiac condition. At the hearing Dr. Cunniff testified that when he examined the petitioner in November 1954 the petitioner's

heart was "slightly enlarged"; that he had "tachycardia," which means a rapid heart rate, and that "his heart sounds were noted as being only of fair quality at best." Dr. Cunniff took electrocardiograms in November 1954, July 1955, October 1955 and January 1956. These tests indicated "myocardial disease" and "an old myocardial infarction in the posterior wall of the heart." His conclusion was that the petitioner had "arteriosclerotic heart disease, with old myocardial infarction; myocardial fibrosis, and poor cardiac reserve." In response to a hypothetical question, which was supplemented to meet the appellant's objections, Dr. Cunniff stated, "It would seem probable" that there was a causal relationship between the petitioner's present condition and the incident which occurred on October 3, 1952. When asked by the Deputy Director, "Is it your opinion that there is a probable connection between his work and his heart condition?" Dr. Cunniff replied: "Yes, sir. That is my opinion." Dr. Cunniff further testified that he did not consider the petitioner able to work and that "he would have to be considered 100% disabled."

On cross-examination, Dr. Cunniff stated that the petitioner was apparently unable to do any type of work; that the petitioner had tried to go to work as a "watchman or something but he was unable to do that because there was some walking involved, which causes pain in his chest." He said that a heart condition could come about gradually but that "It is a well known fact that a person can have a severe heart condition and the cardiograms be negative originally and not show any changes for a number of days * * * even several weeks." He further testified that where a heart condition comes about by reason of a severe strain that it should manifest itself almost immediately. When asked how it would manifest itself he replied: "Well it would manifest itself in pain primarily. There may not be any other manifestation. That is the primary manifestation of any strain." He further stated that the old infarction appearing in the November 1954 electrocardiogram could be any age beyond a few months old. It was his opinion that the petitioner's

heart condition was caused by "lifting and stretching, lifting in an awkward position."

Dr. Frank appeared as a medical witness for the appellant. He stated that when he first examined the petitioner on October 7, 1952, the petitioner complained of "a typical pain, what we call precordial pain, pain along the—over the—left chest with pain down his left arm." On the question of causal relationship he testified:

"Doctor, do you feel that, in your opinion, or can you say with a reasonable medical certainty whether or not the accident complained of could have caused any heart condition? A. May I explain that? Can I, instead of answering that yes or no?

Q. Yes. A. I mean, I can't say it caused any heart condition, because I didn't find any heart condition. Can I put it that way?

But then could some such act bring about a heart condition? Yes, of course. But I didn't find any evidence to indicate that this man had heart disease at the time."

On cross-examination, he testified that the petitioner was hospitalized on October 6, 1952, "just to make sure I was completely satisfied that he did not have heart disease" and "to treat his musculature condition." He was of the opinion that if a physical effort is to induce a heart condition, "the patient should develop signs of cardiac insufficiency within a relatively short span, anywhere from seconds, to possibly a period of twenty-four hours." He stated that the "commonest symptom" of a heart condition is chest pain. He conceded that the "precordial pain" complained of by the petitioner was consistent with "heart trouble." He further stated, "We well know that an initial electrocardiogram may be negative. Even in occlusion, a coronary thrombosis, or even infarct, they are negative many times and, sometimes, as long as ten, fifteen, twenty days later an electrocardiogram may become positive after it is negative." He further stated that the last time he saw the petitioner in February 1953, he was of the opinion that the petitioner did not have heart disease and "that nothing had transpired to bring about heart disease."

The Deputy Director found that the petitioner's heart condition was causally related to the accident and that the extent of petitioner's incapacity had increased since the first award to 100% total permanent disability. The County Court found that the petitioner's present physical condition "is causally related to the 'unusual strain' which occurred when he crawled under a heavy stretcher being carried down a twisting stairway on October 3, 1952," and affirmed the judgment of the Deputy Director. The majority of the Appellate Division affirmed the judgment of the County Court on the ground that there was "substantial evidence" to support the finding of causal relationship.

The city, on this appeal, contends that the petitioner is precluded from relitigating the issue of causal relationship between his presently existing heart condition and the 1952 accident by the principles of collateral estoppel and *res judicata*. It further contends that the evidence was not sufficient to support a finding of causal relationship. Finally, it is urged that the judgment must be reversed because the record is devoid of any evidence of comparative disability.

■ The doctrine of collateral estoppel is not applicable to the petitioner's present claim. The question of the existence of an injury to the petitioner's heart or of the existence of any disability arising therefrom was neither raised nor litigated at the original hearing. It was not "a fact in issue." See *Mazilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland*, 26 *N. J.* 307 (1958).

■ The prior award, which determined that the petitioner was 12½% permanently disabled, is not *res judicata* as to the extent of his presently existing disability arising out of the injuries sustained in the course of his employment on October 3, 1952. The prior award is conclusive as to all questions of law and fact comprehended by that determination, including the nature and extent of the then existing disability. *Hopler v. Hill City Coal & Lumber Co.*, 5 *N. J.* 466 (1950). However, by the terms of *N. J. S. A.* 34:15–27, a prior award of compensation is expressly made subject to the continuing jurisdiction of the Division of Workmen's

Compensation to modify it to accord with a subsequently occurring increase or diminution of the incapacity flowing from the established compensable injury. *Hopler v. Hill City Coal & Lumber Co., supra; Tucker v. Frank J. Beltramo, Inc.,* 117 *N. J. L.* 72 (*Sup. Ct.* 1936); affirmed, 118 *N. J. L.* 301 (*E. & A.* 1937); *Cirillo v. United Engineers & Constructors, Inc.,* 121 *N. J. L.* 511 (*E. & A.* 1939). *N. J. S. A.* 34:15–27 provides in part:

"* * * A formal award, determination and rule for judgment or order approving settlement may be reviewed within two years from the date when the injured person last received a payment, upon the application of either party on the ground that the incapacity of the injured employee has subsequently increased. An award, determination and rule for judgment or order approving settlement may be reviewed at any time on the ground that the disability has diminished. * * *."

By so providing, the Legislature has established a subsequent change in "incapacity" as the determining factor as to whether a prior award shall be increased or decreased. "Incapacity" in this context means inability to perform labor. *Safety Insulated Wire & Cable Co. v. Court of Common Pleas of Hudson County,* 90 *N. J. L.* 114 (*Sup. Ct.* 1917); *Torbyn v. South River Sand Co.,* 6 *N. J. Super.* 1 (*App. Div.* 1949). Thus, a subsequent change in the extent of incapacity is the *sine qua non* to the exercise of the Division's continuing jurisdiction. *Tucker v. Frank J. Beltramo, Inc., supra.* When a subsequent change in the extent of incapacity is alleged, a prior award of compensation does not preclude a later proceeding to recover additional compensation for the increased incapacity, where the petitioner can show that his increased incapacity is causally related to the same accident upon which the initial award was founded. This is the sense of *N. J. S. A.* 34:15–27. To this extent, the normal rule of *res judicata* is not applicable. Justice Heher, in commenting upon the effect of the statutory provision for review of a prior award, in *Tucker v. Frank J. Beltramo, supra,* said:

"The statutory review does not contemplate the undoing of what has been finally determined. It is a measure designed to do strict

justice between the parties * * *. The obvious purpose of this provision is to permit of a readjustment in the award when warranted by a subsequent change in condition. * * * The genius of the provision is the correction of injustice consequent upon the inability of medical and surgical experts to make an accurate prognosis—to forecast with certainty the operation of nature's processes—and it is therefore an entirely reasonable and wholesome measure to effectuate the beneficent object of the statute, *i. e.*, to secure to the injured employee the prescribed compensation for the disability actually suffered."

Nor is the petitioner prejudiced by the fact that the initial award was predicated upon a back injury, while his present claim is founded upon a heart condition. It is only essential that the petitioner show a subsequent increase in the extent of his incapacity arising from, and causally connected with, the same trauma complained of in his original petition. *Ginter v. Westinghouse Elec. & Mfg. Corp.*, 11 *N. J. Super.* 338 (*App. Div.* 1951); *Torbyn v. South River Sand Co.*, 6 *N. J. Super.* 1 (*App. Div.* 1949); *cf. Granahan v. Celanese Corp. of America, Plastics Div.*, 3 *N. J.* 187 (1949).

The city next contends that the petitioner's present degree of incapacity is not causally related to the trauma sustained on October 3, 1952.

It is no longer requisite in a heart compensation case that the petitioner show that the heart injury was the result of an "unusual strain." *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N. J.* 127 (1958). However, the presumption subsists that injury from heart disease is the result of natural physiological causes, and the onus remains upon the petitioner to show by a preponderance of the probabilities that his employment was a contributing cause of the injury. The test as to whether a petitioner in a heart case has sustained the burden of proof was stated by Justice Heher in the *Ciuba* case as follows:

"In its nature, an exertion-induced injury may be difficult to prove when it involves coronary occlusion, myocarditis or dilatation of the heart. But the issue, after all, as in other civil cases, is whether the burden of proof has been sustained. 'Reasonable probability' is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the tendered hypothesis is in all human like-

lihood the fact. Does the evidence reasonably give rise to a circumstantial inference of the requisite causal relation? Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as 'a mere preponderance of probabilities, and, therefore, a sufficient basis for decision.' *Jackson v. Delaware, L. & W. R. R. Co.*, 111 *N. J. L.* 487 (*E. & A.* 1933). It need not have the attribute of certainty, but it must be a presumption well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof. The determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind. The accepted standard of persuasion is that the determination be probably based on truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is 'the feeling of probability which it engenders.' "

Assessed in this light, we think the evidence sustains as a reasonable probability the petitioner's hypothesis of a work-induced heart injury which resulted in an increase in his incapacity subsequent to the date of the first award. The petitioner, a man just over 40 years of age and apparently in good physical condition, while engaged in the strenuous task of maneuvering a heavily burdened stretcher down a narrow stairway, suffered precordial pain in his chest and down his left arm. It was shown at the hearing that precordial pain is a common symptom of a heart attack and consistent with the existence of heart impairment. Dr. Frank, when told of these symptoms, immediately suspected a heart condition and directed that the petitioner be given electrocardiogram tests and be hospitalized "in order to rule out heart disease." Much emphasis was placed upon the fact that an electrocardiogram and other tests taken within a period of from 1 to 18 days after the accident were all negative. However, it was conceded by Dr. Frank that an electrocardiogram may not indicate an existing cardiac injury within 20 days after it occurred. Dr. Cunniff testified that even after a person had a severe heart condition the electrocardiogram may be negative for several weeks thereafter. Both physicians were in substantial accord on this point as well as in the conclusion

that precordial pain is generally the most immediate and most common symptom of a heart injury. Dr. Frank performed no tests for heart disease after October 22, 1952 and has not examined the petitioner since February 11, 1953. The electrocardiograms taken by Dr. Cunniff in November 1954 indicated an "old" myocardial infarction which could have represented a heart injury incurred on the stairway in October 1952. It is not without the realm of reasonable probability that an electrocardiogram taken at any time subsequent to October 22, 1952, would have revealed the same infarction. It is undisputed that petitioner's condition became progressively worse since October 3, 1952. He was admitted to various hospitals in January 1953, April 1953, February 1954, November 1954, July 1955, October 1955 and January 1956. While the medical testimony is susceptible of conflicting causal hypotheses, the fact that the petitioner's physical condition has steadily deteriorated from the date of the trauma cannot be ignored. This circumstance, coupled with petitioner's symptoms immediately following the trauma, which were characterized as typical of a heart impairment, lends weight to petitioner's hypothesis that his present condition is causally related to the incident of October 3, 1952. It is conceded that the extent of the petitioner's incapacity has increased and that he is presently 100% permanently disabled as a result of his heart condition. The proofs indicate that at the time of the first award the petitioner, while unable to perform heavy work, retained some capacity to perform labor as evidenced by the fact that he was capable of performing "light duty" but following that award the petitioner's condition worsened until he was unable to do any type of work.

It is the duty of this court when reviewing a determination by the Deputy Director and County Court in a compensation proceeding to independently weigh the evidence and determine whether the claimant has sustained the burden of proof. *Russo . v. U. S. Trucking Corp.,* 26 *N. J.* 430 (1958); *Ricciardi v. Marcalus Mfg. Co.,* 26 *N. J.* 445 (1958). It is our opinion that upon a total consideration of the record the evidence bearing upon the issue of causal relationship

preponderates in favor of the petitioner's hypothesis. The evidence supports fairly a rational inference that the petitioner's present heart condition is causally related to the injury he sustained on October 3, 1952, and that the extent of his incapacity attributable to that injury has increased subsequent to the date of the first award to his present state of 100% incapacity.

The city finally contends that the award of compensation for the increase in petitioner's degree of incapacity is defective because the petitioner failed to compare his present degree of incapacity with his degree of incapacity at the time of the first award. It is true that in a proceeding for additional compensation due to an alleged subsequent increase in incapacity the claim for increase is grounded in the comparative condition and ability of the workman. The claim must be supported by proofs which permit comparison and cannot be based *solely* upon an estimate of the injured person's present degree of incapacity. *Hopler v. Hill City Coal & Lumber Co., supra; Cirillo v. United Engineers & Constructors, Inc.,* 121 *N. J. L.* 511 (*E. & A.* 1938) ; *Florek v. Board of Education,* 18 *N. J. Super.* 425 (*Cty. Ct.* 1952). In the *Cirillo* case it was said 121 *N. J. L.* at *page* 514:

"We think that opinion evidence of present disability based only upon existing physical or mental condition, standing alone, is not competent to sustain a finding on the relative fact of an *increase* or a *decrease* in disability. To make such testimony competent for that purpose the witness should at least be informed from his own knowledge, made manifest, or from proofs *aliunde* incorporated into a question, what the workman's condition was at the time when the court rated it at a fixed partial permanent disability. The use of the word 'increase' or of the word 'decrease' connotes two states of physical condition, one which was and one which is, and there must be knowledge of each state in order to support a conclusion that the present condition marks an increase or a decrease."

In the case *sub judice* the record reveals that although the petitioner's medical witness, Dr. Cunniff, had not examined petitioner prior to the first award, he had reviewed the petitioner's entire medical history including his hospital records. He was informed from his own knowledge, which he

made manifest, as to the nature of the petitioner's physical condition at the time of the first award. It is conceded that the petitioner's incapacity has increased subsequent to the first award. Neither party contested the correctness of the original finding that the petitioner was $12\frac{1}{2}\%$ permanently disabled at that time due to his back condition. It is conceded that he is presently 100% disabled due to his heart condition. It cannot be said that Dr. Cunniff's testimony was based solely upon his opinion of the petitioner's present physical condition. In a subsequent proceeding founded upon an increase in incapacity where the extent of petitioner's incapacity at the time of the prior award is not disputed and competent medical testimony, embracing knowledge of the petitioner's former condition, establishes an increase in incapacity to 100% of total disability, which is conceded to exist, we think that there is a sufficient basis for the requisite comparison. Moreover, the city both before the Deputy Director and the County Court did not complain that there was insufficient evidence to show a comparative change in the petitioner's condition.

The judgment is affirmed.

Burling, J. (dissenting). Giving due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses, still the result of an independent evaluation of the evidence on this appeal leads me to the conclusion that the claimant has not sustained the burden of proof imposed upon him. *Russo v. U. S. Trucking Corp.,* 26 *N. J.* 430 (1958); *Ricciardi v. Marcalus Manufacturing Company,* 26 *N. J.* 445 (1958). Accordingly, I dissent from the factual determination of my colleagues on the majority.

Petitioner must, of course, establish by a reasonable probability that the incident on October 3, 1952 was causally related to his alleged present condition.

There can be no question that petitioner's complaint of precordial pain and pain running down his left arm could have been symptomatic of a cardiac condition. And, if a cardiac condition was manifested for the first time imme-

diately following the strain in carrying the stretcher, the sequence of events would establish a reasonable probability of causal relationship.

But the symptoms alone, and without further confirming clinical evidence, do not establish heart disease by a reasonable probability. As stated by Dr. Frank:

"There is no specific site, but we do know that precordial pain, pain over the so-called rheumatoid site of heart disease, is usually not due to heart disease.

When a patient comes to us and says, 'I have a pain here,' then we occasionally do find heart disease. It's more often not present than present."

There was no substantial disagreement on this score by Dr. Cunniff, who testified that "many things" can cause precordial pain.

The significant fact in this case is that confirmation of a cardiac condition was not forthcoming.

Petitioner was hospitalized from October 7, 1952 to October 22, 1952. During this period he received three electrocardiograms, his chest, stomach and intestinal tract were X-rayed and other clinical tests including blood counts, a urinalysis and sedimentation rates were performed. All of these were negative as to any condition relative to his heart. It is noteworthy that Dr. Cunniff who had examined the electrocardiograms previously stated, "I will accept the fact that they are negative."

Both the majority in the Appellate Division and in this court stress the fact that no such tests were performed after October 22, 1952 and until November 1954 when Dr. Cunniff performed an electrocardiogram which indicated an "old" myocardial infarction and that tests, if they had been performed, might have revealed such an infarction. The testimony of Doctors Frank and Cunniff as to the length of time it might take an injury to the heart to manifest itself on an electrocardiogram was similar. Dr. Frank testified that the reason petitioner was kept in the hospital from October 7 to October 22, 1954 was that an initial electrocardiogram

may be negative but that sometimes, as long as 10, 15 or 20 days later, it may prove positive. Dr. Cunniff testified that an electrocardiogram may not show positive "for a number of days" "and even several weeks."

Counting the day of the injury, petitioner was not released from the hospital until 20 days had elapsed. That an electrocardiogram administered after October 22, 1952 might indicate a change to positive would, in my view of the evidence, be a mere possibility and not a reasonable probability. Moreover, petitioner was examined by Dr. Frank on October 27, 1952 and February 11, 1953 and he found no cardiac condition on both those visitations.

It is equally significant that neither petitioner's doctor, Dr. Marcus, nor the city's doctor, Dr. Visconti, at the hearing on the prior compensation award found any evidence of a myocardial infarction of the heart wall. Dr. Marcus testified that petitioner's injury was orthopedic in nature, although he testified that the petitioner had cardiorespiratory symptoms about two years prior to the accident. It was his conclusion that there might be "a medical disability which is probably cardiorespiratory in nature and which is unrelated."

Dr. Visconti testified: "There was an old associated cardiorespiratory pathology not related to the trauma in question and which antedated the accident in question."

While Dr. Cunniff found a myocardial infarction in November 1954 (the date of his first examination) all he could say was that it was more than several months old. Four doctors (Frank, Costello, Marcus and Visconti) who examined the petitioner prior to November 1954 could find no cardiac condition causally related to the incident of October 3, 1952. Petitioner came under Dr. Frank's care several days after the injury. Intensive clinical tests, including three electrocardiograms, given up to 20 days following the accident, showed negative. In sum, the inference that one could draw that the myocardial infarction found in November of 1954 resulted from the incident more than two years before, is greatly outweighed by the direct medical evi-

dence negating the existence of any causally related cardiac condition prior to November 1954.

I vote to reverse the judgment appealed from, resulting in the denial of increased compensation.

Mr. Justice WACHENFELD joins in this dissent.

*For affirmance*—Chief Justice WEINTRAUB and Justices HEHER, FRANCIS and PROCTOR—4.

*For reversal*—Justices WACHENFELD and BURLING—2.