57 N.J. Super. 470 (1959)
155 A.2d 129
MARIE MOCCIA, PETITIONER-APPELLANT,
v.
ECLIPSE PIONEER DIVISION OF BENDIX AVIATION, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued October 19, 1959.
Decided October 26, 1959.
*472 Before Judges GOLDMANN, CONFORD and HANEMAN.
*473 Mr. Sol D. Kapelsohn argued the cause for appellant (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
Mr. George A. Vaccaro argued the cause for respondent (Mr. Walter H. Jones, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioner appeals from a disallowance by the County Court of that part of an award granted in the Division of Workmen's Compensation based on the deputy director's finding of 12 1/2% of total disability attributable to neurological causes. Resolution of the appeal involves a consideration of earlier proceedings in the Division.
In December 1951 petitioner contracted an occupational contact dermatitis while in respondent's employ, for which she was treated by several doctors. She has suffered sporadic outbreaks of the condition, extending to different parts of her body. She has not worked since December 19, 1955 because of her disability.
Petitioner's first compensation hearing was before Deputy Director Winfield who, in February 1953, determined that she had sustained 3 1/2% of partial total permanent disability. His findings contain no reference to any neurological condition but expressly state that the award was for occupational contact dermatitis. There was no appeal.
The case was reopened by the filing of a petition for increased disability which came on for hearing before Deputy Director Kerner in June 1955. He awarded petitioner an increased permanent disability of 2 1/2% of total. His determination makes no reference to neurological disability; the increased award was specifically stated as being for occupational dermatitis. No appeal was taken.
In May 1956 Deputy Director Kaltz took the testimony of petitioner and two dermatological experts in connection with a second petition for increased disability. He made an award of 10% of total for increased permanent disability. In his specific findings forming part of the determination, award and rule for judgment he defined the accident as *474 occupational dermatitis and stated that the permanent disability resulted from contact dermatitis. Again there was no appeal. We shall shortly refer to the Kaltz proceedings in greater detail.
In October 1956, about five months after the Kaltz award, petitioner's condition became worse, requiring extensive treatment. She filed a new petition in February 1957. The matter came on for hearing in September 1957 before Deputy Director Ferster. On the first day of the hearing, as a result of the testimony and the deputy's personal observation of petitioner, the hearing was adjourned at his suggestion and both parties were persuaded to permit Mrs. Moccia to be treated by a New York City specialist. He treated her for almost 23 weeks, during which time the insurance carrier made temporary disability payments. The hearing was resumed in June 1958, resulting in a finding by Deputy Director Ferster of 50% total permanent disability. He said, "I further find this to be a dissemination of dermatological condition of her body, of which 16% has already been paid, and I therefore find the increase in her incapacity to be 34% of total, with 12 1/2% of this disability neurological and 21 1/2% dermatological."
The employer thereupon appealed to the County Court with respect to both the dermatological and neurological allowances. The County Court was of the opinion that the dermatological award was fully supported by the evidence, and affirmed it. However, the 12 1/2% neurological award was disallowed for the reasons hereinafter stated.
There is no dispute that there was no neurological factor involved in the first two hearings before Deputy Directors Winfield and Kerner, respectively. The real question involved in this appeal is the basis upon which Deputy Director Kaltz made his award. Respondent employer insists that in finding a 10% increased disability he was determining disability on a neurological and not a dermatological basis, and since petitioner had not, at the hearing before Deputy Director Ferster, established a comparative basis upon which *475 to conclude that there had been an increase in disability, the award of 12 1/2% for neurological disability was without foundation. Hopler v. Hill City Coal & Lumber Co., 5 N.J. 466 (1950).
The full transcript of the testimony taken before Deputy Director Kaltz, together with his oral opinion, have become part of the record on this appeal as a joint exhibit. That record, which includes the testimony of the two dermatological experts who respectively testified for petitioner and respondent, is completely devoid of any neurological or psychological reference. By contrast, the testimony taken before Deputy Director Ferster is replete with testimony of that character.
Dr. Shapiro, petitioner's dermatological expert in the Ferster hearing, also testified to substantial neurological disability. He was not able to estimate its precise percentage as a condition separate from the dermatological disability, but he insisted that the neurological factor was there. He admitted he was not a neurologist or psychiatrist, but pointed out that he had developed some experience in his 20 years of treating patients as well as in the medicine of the skin; and he observed that the neurological field undoubtedly impinged on his speciality.
Dr. Samuel Pollock was petitioner's neurological expert at the Ferster hearing. He had not examined her in connection with the prior hearing before Deputy Director Kaltz, but saw her on March 2 and September 21, 1957, and again on June 5, 1958. He testified that petitioner was suffering from a "severe anxiety neurosis with depression, associated with a chronic dermatitis affecting at various times all parts of her body." In response to a hypothetical question he gave it as his opinion that the neurosis was definitely and directly causally related to the dermatitic condition. He estimated petitioner's permanent neurological disability at 25% of partial total.
Dr. Pollock specifically testified that the neurological condition was of recent origin. He said there may have been some prior anxiety, but the actual neurosis was a newly *476 developed thing, explaining on cross-examination just how this had come about. It had been his experience that in cases of dermatitis like petitioner's a severe depression with hysterical reaction such as he had observed in her takes a long time to develop. In petitioner's case the neurosis had come about since the last hearing before Deputy Director Kaltz. It had come to full development because petitioner had finally lost all hope that she would ever be cured of the dermatitis which had so altered her life and which, in his opinion, was so rooted that it would definitely alter her personality for the rest of her days. Dr. Pollock particularly noted an increase from his 12 1/2% neurological estimate as of March 1957 to his 25% estimate as of June 1958.
Respondent presented as its neurological expert Dr. M.W. Bergman. He had examined petitioner on April 1, 1957, at which time he found neuropsychiatric disability of 5% of partial total. A second examination on June 6, 1958 showed an increase in this disability to 10% of partial total. He described the condition as "an overall neurosis," first manifesting itself in 1956. In diagnosing petitioner's condition he had given full credence to her subjective complaints, as had Dr. Pollock. We find nothing in Dr. Bergman's testimony which contradicts Dr. Pollock.
We come, then, to the question of whether the 10% award made by Deputy Director Kaltz was based upon a neurological condition. In maintaining that it was, respondent places great stress on what the deputy had said at the close of the hearing. After referring briefly to the earlier compensation proceedings he spoke of the marked division of opinion in the testimony as to causal relation between petitioner's then condition and the original exposure, as well as of the disagreement as to the extent of her permanent disability. He then went on to comment generally upon the trend of professional opinion concerning the eventual neurological and psychiatric results of a long-continued dermatological condition, observing that
*477 "* * * Very often there is what appears to be a simple contact dermatitis which turns into a neurodermatitis.
I am of the opinion, realizing both doctors are experts in their respective fields, that in the instant case there is a large psychogenic overlay, and that the neuro-psychiatric aspects are playing a very important part."
It is from these comments, and petitioner's reference to her condition in testifying before Deputy Director Kaltz, that respondent claims that the increased disability he awarded was for a neurological condition. From this conclusion respondent proceeds to argue the proposition that since there was no comparative evidence adduced before Deputy Director Ferster to indicate a worsening of the neurological condition, he could grant no increased disability for that condition.
We recognize that an increase in an award under N.J.S.A. 34:15-27 must be predicated upon a comparison of two conditions and cannot be grounded solely upon an estimate of the injured person's present degree of disability. Hopler v. Hill City Coal & Lumber Co., above, 5 N.J. at pages 471-472, quoting from the leading case of Cirillo v. United Engineers & Constructors, Inc., 121 N.J.L. 511, 514 (E. & A. 1938). On a petition for increased disability, testimony comparing petitioner's present disability with that existing at the first hearing, to determine if any change has occurred since the last award, is a sine qua non to establishing the increase. Florek v. Board of Education of Newark, 18 N.J. Super. 425, 431-432 (Cty. Ct. 1952); Licker v. J.G. Martin Box Co., 127 N.J.L. 136, 141 (Sup. Ct. 1941). In such case the burden of proving an increase in disability rests upon the petitioner. Pasquale v. Clyde Piece Dye Works, Inc., 120 N.J.L. 557, 563 (Sup. Ct. 1938).
In this case it is clear that if the neurosis did not develop until after the third hearing before Deputy Director Kaltz, then there is nothing with which to compare it. That is, if the disability, up through the third hearing, was entirely a physical one (whether its cause was physical or psychological), *478 then an increase in disability due to a new and strictly psychological complaint, with both psychological causes and symptoms, resulting from the same trauma but manifested later, can be established by indicating that the combined physical condition and psychological condition rendered the petitioner more disabled than she would be if she were suffering only from the physical manifestations. See Yeomans v. Jersey City, 27 N.J. 496, 507-509 (1958); Florek v. Board of Education of Newark, above, 18 N.J. Super. at page 429; Ginter v. Westinghouse Electric & Mfg. Corp., 11 N.J. Super. 338, 341-342 (App. Div. 1951), certification denied 7 N.J. 81 (1951). We are of the opinion that petitioner has established just such a case, as an examination of the testimony of Dr. Pollock will show, supplemented by that of respondent's expert and Dr. Shapiro.
The question remains, therefore, whether or not the existance of a neurosis was either raised, litigated or determined in the Kaltz proceeding. The County Court judge was of the opinion that Deputy Director Kaltz had indicated in his oral opinion that part of his award was based on a neurological condition, and under these circumstances, and for that reason only, comparative testimony as to that condition was indispensable to support the award made by Deputy Director Ferster. He rejected the 12 1/2% award for neurological disability because there had been no such comparative neurological testimony evaluating petitioner's condition as of the time of the Ferster hearing with relation to her condition as of the time of the Kaltz award.
We are of the firm conclusion that a neurosis or neurological condition, in the sense of disability separate and apart from the disability constituted by the physical skin condition itself, was never a fact issue in the Kaltz hearing. Petitioner based her claim solely on dermatitis, as she had in the two earlier hearings. As we have noted, neither of the two dermatological experts who appeared at the Kaltz hearing in any way referred to a neurological or psychological condition. Petitioner's testimony, too, was devoid of any *479 claim or evidence of psychological symptoms; the only bit of evidence possibly relevant to establishing such symptoms was her statement that she had lost weight and had difficulty in sleeping. (Contrast this with the testimony at the final hearing before Deputy Director Ferster that petitioner had constant headaches, was nervous, did not sleep nights, had trouble with her husband, was embarrassed in public, had continual and repeated attacks of acute weeping, was depressed, and suffered the feeling of an outcast.)
At no place in his oral opinion did Deputy Director Kaltz say that there had been any lay or medical testimony as to neurological disability, nor did he refer to anything in the record to that effect. And he did not state that any part of his award was for neurological disability. Of fundamental significance is the fact that his determination, award and rule for judgment made a direct finding that the injury which occurred was "occupational dermatitis" and the permanent disability resulting was "contact dermatitis." It is the Division judgment and not the oral opinion which establishes just what had been decided. Cf. Hughes v. Eisner, 8 N.J. 228, 229 (1951); Giumarra v. Harrington Heights, 33 N.J. Super. 178, 193 (App. Div. 1954) affirmed 18 N.J. 548 (1955).
The only meaning that can reasonably be given Deputy Director Kaltz' remarks, in the context of his formal determination, award and rule for judgment, is that the physical condition which was the cause of petitioner's disability was the result of psychological (precisely what "psychogenic" means) as well as physical causes. His finding of disability was therefore based solely on the dermatitis.
An anxiety neurosis, such as was testified to by Dr. Pollock, is quite different from a neurological dermatitis, since it is a psychological illness with purely psychological symptoms and hence represents an entirely different complaint from the latter, which is a skin condition caused by psychological factors. Deputy Director Kaltz may have been finding a neurological dermatitis, but he could not have found the *480 neurological condition  i.e., a neurosis  claimed in the proceeding before Deputy Director Ferster and for which an allowance was made. If the neurosis was in fact present at the time of the Kaltz hearing, as respondent claims, it could not have been a basis for the award then made since there was no claim or evidence thereof. And if it did exist, it was either not recognized or was so trifling as to be discounted. See Yeomans v. Jersey City and Ginter v. Westinghouse Electric & Mfg. Co., above; Torbyn v. South River Sand Co., 6 N.J. Super. 1 (App. Div. 1949).
We conclude that the Kaltz award was in no degree predicated upon neurological disability, but simply assessed the increase in dermatological disability that had occurred since the second hearing. Although the figure of 12 1/2% partial total disability, neurological in nature, is not disputed, we find there was adequate testimony, both expert and lay, to substantiate Deputy Director Ferster's finding.
The County Court's reversal was based on its misconception regarding the basis of the Kaltz award, and must therefore be reversed and the original Ferster award reinstated.