88 N.J. Super. 478 (1965)
212 A.2d 786
ANNE MARIE KOLAKOWSKI, A/K/A ANNE MARIE PINO, AS PARENT AND NATURAL GUARDIAN OF MARIANNE PINO AND WILLIAM PINO, INFANTS, SUBSTITUTED FOR EDWARD PINO, DECEASED, PETITIONER-APPELLANT,
v.
THOMAS MANUFACTURING CORPORATION, RESPONDENT-APPELLEE.
PETER EDWARD PINO AND MICHAEL PINO, SONS OF EDWARD PINO, DECEASED, BY ROSALYN AMANIERA, MOTHER AND NATURAL GUARDIAN, PETITIONER-APPELLANT,
v.
THOMAS MANUFACTURING CORPORATION, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1965.
Decided June 29, 1965.
*480 Before Judges GAULKIN, FOLEY and COLLESTER.
Mr. Graham Roskein argued the cause for Marianne Pino and William Pino (Mr. William F. Nies, attorney).
Mr. Seymour B. Jacobs argued the cause for Peter Edward Pino and Michael Pino (Messrs. Balk & Jacobs, attorneys).
Mr. Isidor Kalisch argued the cause for Thomas Manufacturing Corporation.
The opinion of the court was delivered by GAULKIN, S.J.A.D.
On October 21, 1957 Edward Pino suffered an injury to the right testicle while at work. Embryonal carcinoma (cancer) developed in the testicle and, on January 31, 1958, it was excised. Thereafter, from February 20 to April 28, 1958 he was subjected to 47 treatments of deep x-ray radiation therapy. He died on September 25, 1960.
Prior to his death, decedent filed a claim for workmen's compensation. At the hearing thereon, held on March 26, *481 1959, the employer stipulated that the carcinoma had been activated by the trauma and was causally related to the work accident. An award was entered on April 10, 1959 for loss of a testicle and for neurosis, and for payment of all medical and hospital expenses, including x-ray therapy. Decedent's attorney stipulated there was no longer any cancer present on the hearing date. No reference was made to sterility as a basis for compensation.
Thereafter, decedent himself filed a claim for increased disability due to sterility. This petition had not yet been heard when he died. In addition, separate petitions claiming dependency death benefits were filed on behalf of decedent's illegitimate children, Marianne and William Pino, and his legitimate children, Peter and Michael, claiming death was caused by radiation treatment. All the petitions were consolidated for trial in the Division.
Decedent's wife, Mrs. Amariera, divorced him in 1953. During their marriage, two children were born: Peter in 1947, and Michael in 1952. Prior to the divorce, Mrs. Amariera twice obtained orders in New York to support the children. She remarried in 1953, within a month after the divorce. Decedent last gave her support money two months after the divorce. Mr. Amariera supports her and the children, and though the children were never legally adopted they go to school under the name Amariera.
Decedent lived with Anne Marie Kolakowski from 1956 until his death though not married, during which time he supported her and his illegitimate children: Marianne, born July 28, 1957, and William, born August 11, 1958.
The judge of compensation held that petitioners had, by a preponderance of the credible proofs, shown that the sterility and death of Edward Pino were due to the radiation injury, and were causally related to the accident and the radiation therapy; and that all four children were dependents of decedent and entitled to dependency death benefits. In addition, he held that the legitimate children were entitled to the benefits for the increased disability due to sterility.
*482 Upon appeal, the County Court reversed. It held that the death was not due to the radiation treatments and therefore was not compensable, and, although it found the sterility was due to the treatments, decedent became sterile prior to the hearing upon his original petition and therefore there was no "increased disability." The County Court therefore did not decide the questions of dependency and rate of compensation. Petitioners appeal.
We appreciate that this is an appeal from the findings of the County Court and that we must "accord determinative weight in the first instance to [its] findings * * * and not those of the deputy director whom it reversed." Gibson v. Todd Shipyard Corp., 48 N.J. Super. 535, 536 (App. Div. 1958). Close v. Kordulak Bros., 44 N.J. 589, 210 A.2d 753 (1965), instructs us that "the standard to govern appellate intervention with respect thereto is * * * `whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Applying those rules to the evidence in the case at bar, we find that the judgment of the County Court must be reversed and that of the judge of compensation reinstated.
Anne Marie Kolakowski testified that during the x-ray treatments decedent became ill with vomiting and diarrhea, which he never had before; there were sections of burning on his body on which she put sulfa powder at Dr. Ibranyi's directions; and the scarring from the burns never went away.
Dr. Gustav L. Ibranyi was the decedent's "family" physician. Judge of Compensation Prioletta summarized his testimony, accurately, we think, as follows:
"We must consider the testimony of Dr. Ibranyi, who was the treating doctor in this case originally, and continued to be the treating doctor up to the date of the death of Mr. Edward Pino. Dr. Ibranyi testified that, following the radiation therapy, Edward Pino developed severe first and second degree burns from the X-ray to his entire abdominal wall and the burns required extensive treatment * * *. *483 * * * the burns took three months to heal * * * subsequent to the termination of radiation therapy, he saw Mr. Edward Pino regularly up to the date of his death, when he treated him for weakness, tiredness, nausea, severe nervousness, abdominal cramps, and at times, diarrhea. Dr. Ibranyi saw Mr. Edward Pino more or less regularly up to July 7, 1960, and did not see him until he had him admitted to the hospital on September 15, 1960.
Dr. Ibranyi expressed the opinion that the complaints of nausea and abdominal cramps and diarrhea were directly related to the radiation therapy, in view of the fact of the severe burns, which he described."
Dr. Ibranyi said that when he operated on decedent he found a generalized peritonitis; that the germs found in the peritoneal cavity, E coli, are normally only found in the intestines, and their presence there was, in his opinion, the result of the radiation. On cross-examination, Dr. Ibranyi admitted that no perforation of the bowel or intestine was found, but said that germs were able to spread from the intestine into the abdominal cavity as a result of the scarrings which lowered resistance in the intestinal walls and let seepage through in those areas. This process of seepage is called diapedesis.
Dr. Leonard S. Ellenbogen, a specialist in radiology and oncology, did not examine decedent but was sent Pino's complete medical file by petitioners' attorney. He testified that, while the radiation therapy given decedent was the proper postsurgical treatment, it "caused a radiation enteritis in and adjacent to the areas of treatment which resulted in the gastro-intestinal symptoms described * * * the radiation enteritis * * * of the ulcerative type and * * * was the basis for the development of the acute peritonitis which was the terminal event in the whole series of events leading to the death of this individual." He said his opinion as to causal relation was not diminished by the fact the autopsy did not disclose a perforation because "an extensive ulcerative enteritis was found, almost complete submucosa was found * * * Its permeability, its leakiness, increased." The fact that radiation therapy ended on April 28, 1958 and admission *484 to the hospital was in September of 1960 did not change his opinion as to causal relation: "I think it is a very usual interval between magnating [sic] and final event in the course of radiation necrosis of the bowel * * * in the course of [x-ray] treatment, where there is scattering [of radiation], the bowel isn't entirely overwhelmed at first, it takes time for these terminal effects to become manifested."
Dr. Salvatore J. Rose, chief pathologist and director of laboratories of St. Michael's Hospital, Newark, testified as to the performance of the autopsy. The cause of death reported in the autopsy was "acute generalized peritonitis, E coli, resulting from ulcerative enteritis." He testified:
"* * * The ulcerative enteritis was attributed to the effects of radiation since there was no specific disease * * * to explain it. The presence of E. coli in the peritoneal contents indicated that there was leakage but since careful examination of the entire bowels, that is large and small, revealed no evidence of a perforation or rupture site, the peritoneal contents were interpreted as the result of simple seepage through a devitalized bowel wall by a phenomenon termed medically as diapedesis * * *."
He said "one of the ulcers might have had a very small pinhole perforation * * * which became obscured by the adhesion of an adjacent loop of bowel to that site, sealing it off." He concluded:
"In the absence of any primary significant pathology it is my opinion that the intestinal and abdominal findings were the results of the imposition of the effects of radiation therapy. These were most evident on the skin with the first and second degree burns and on the condition of the bowel wall itself * * *."
Dr. Koeck testified he specializes in radiation therapy treatment of cancer and treated decedent personally in the right groin and right scrotal sac areas, but therapy on the abdomen was performed by technicians following a treatment plan prescribed by Koeck. He said he never gave decedent a dose greater than 3,300 r., and that his treatments had nothing to do with Pino's death. He pointed to the fact that "The *485 diagnosis made after both gross and microscopic autopsy, findings of all the tissues, did not give any evidence of any radiation changes at all in any of the tissues from the skin * * * All the tissues of the small bowel and the stomach described by the pathologist show recent acute inflammatory changes. They do not show old fibrotic scarring or changes that would have occurred if radiation had been given two and a half years before this patient died."
On cross-examination, Koeck admitted his records disclosed a notation "5/1/58, clearing up nicely on skin of abdomen." He estimated the proper tumorsidal dose for embryonal carcinoma at "between 4,000 and 5,000 r." but gave as his reason for giving only 3,300 r. that "at that time we only had available 250 kv equipment." However, he admitted the machine could have given more than 3,300 r. He admitted there are people who are hypersusceptible to effects of radiation and such hypersensitivity is shown by skin reactions, vomiting, diarrhea, and reduced blood count. He testified that the following could all be symptoms of radiation injury: weakness, tiredness, nausea, abdominal cramps, diarrhea, poor appetite, vomiting, abdominal pain, loss of weight, and distension of stomach. Decedent had complained of all or most of these things. He also admitted there could be a rupture of an ulcer months or years after the original radiation therapy which would liberate pathogenic bacteria and cause inflammatory changes in the intestines and peritoneum.
Dr. Milton Friedman, a specialist in radiation treatment, in response to a hypothetical question, said that in his opinion "* * * the cause of his death was not related to the accident or the treatment given to the testis tumor following the accident." He gave eleven "points" or reasons for his opinion. Among them were (1) the tumor dose was 3,300 r.; the smallest dose accurately measured and known to cause injury to the smallest intestine in a man was 4,200 r.; (2) a 250 kilovolt x-ray machine is too weak to produce intestinal injury; (3) at the post-mortem examination, the fat over the abdomen was yellowish, soft and measured up to three centimeters *486 thick; large doses of x-ray destroys fat and replaces it with scar tissue; (4) there was no hole in the intestine; (5) he examined three slides of the post-mortem specimens: certain features of radiation injury were not present, such as damage to the "valleys" of the villi; (6) the transverse colon was not at all injured and did not even show mild radiation effects; (7) no progressive endarteritis obliterans (progressive obliteration of small terminal end arteries in the intestine).
On cross-examination, Dr. Friedman stated "The peritonitis results from a perforation of the intestines. It occurs as a late delayed effect of the radiation and I remind you in this case there was no perforation." He admitted a great portion of his opinion was based on the complete acceptance of Dr. Koeck's report that he did not use more than 3,300 r.'s and that decedent did not develop any serious cutaneous or dermatological or skin burns. He stated it was possible to give as much as 10,000 r. with a 200 kilovolt machine. He agreed with the following statement from recognized authority: "It is also shown that the same dosage of irradiation causing damage to the gastro-intestinal track in one person can be tolerated by another patient without any damage." Dr. Friedman admitted giving an address during which he made the following statements:
"* * * It is difficult to assign a specific tolerance dose for each organ below which no injury will occur, because a safe dose is frequently sublethal to the tumor. Therefore a calculated risk of radiation injury must be assumed when using large doses. When radiation injury is imminent, its progress can be interrupted at an early stage, when surgical extirpation has a good chance of success.

* * * * * * * *
A tolerance dose can be stated for each organ, but it is only approximate. There will always be an atypically hyper-sensitive organ which may succumb to an allegedly safe dose."
He agreed with the following statement by a recognized authority:
*487 "One of the most frequent complications has been disturbance of the gastrointestinal track. Various degrees of obstruction are encountered in the colon, less marked in the small bowel. The small bowel is more mobile than the colon and is probably not subjected to the constant irradiation as is the fixed colon. The most constant findings are ulceration and perforation, matting and fixing of the intestinal loops, shortening and narrowing of the lumen. These findings often occur one to four years following treatment."
On re-direct, he stated that in his opinion the gastric symptoms prior to decedent's final admission to the hospital were related to nonspecific ileitis rather than x-ray therapy.
The autopsy report, introducd into evidence by petitioners, stated in part:
"When the patient came to autopsy, the abdomen was distended and the peritoneal tissues covered with fibrinous and small areas of purulent exudate. Careful search of outer gastric intestinal tract failed to reveal any sign of perforation. There was an ulcerative enteritis involving the ileum of a non-specific nature. Since E. coli was recovered from the abdominal contents at operation, there was undoubtedly leakage of intestinal contents which may have occurred through diapedesis. No metastases from the original testical growth could be found anywhere.
When this case came to surgical mortality conference, the consensus of opinion was there had been a perforation but was no longer discoverable mase [sic; because?] of peritonitis. The possible role of radiation therapy to abdomen was considered and the effect of such therapy on the bowel discussed. Since there was no other demonstrable organic pathology, acute generalized peritonitis (E coli) resulting from ulcerative enteritis was given as cause of death."
The burden of the petitioners is to show, by a reasonable preponderance of the probabilities, causal connection between the work-connected injury and the resulting disability or death. It seems to us that petitioners have showed that so clearly that the decision of the County Court to the contrary must be reversed.
Since it was testified that 4,000-5,000 r. was necessary to treat an embryonal carcinoma, it may be that Dr. Koeck gave that dose. If so, it is admitted such doses could cause radiation injury and death. If so, it is admitted such doses could cause radiation injury and death. Assuming, however, that *488 Dr. Koeck did in fact give only 3,300 r., the doctors agreed that some people are hypersensitive to radiation. We think the evidence shows that 3,300 r. could cause radiation injury to such a patient. Dr. Koeck testified a hypersensitive person would be discovered before the end of therapy by reason of certain symptoms; and Pino had them.
Dr. Friedman admitted he relied also on Dr. Koeck's report that Pino had no burns. As to the burns, Koeck's records disclosed a reddening of the abdomen; Drs. Ibranyi and Rose testified as to first and second degree burns; Mrs. Kolakowski testified to treating decedent's burns.
Since there is no positive proof of perforation, the evidence shows that diapedesis was the probable means by which the E. Coli entered the peritoneal cavity, for there was no other pathology or history of illness, past or present, that would account for the peritonitis.
It is well settled that where the employer disputes the connection of the disability and the work injury after petitioner has, by a preponderance of the credible proofs, shown such relation, the burden shifts to the employer to come forward with proof that the disability might be the result of another cause.
In short, our review of the record, with deference to the opportunity of the judge of compensation to hear the witnesses and evaluate their testimony, leaves no doubt in our minds that radiation injury was the cause of decedent's death.

II.
The County Court agreed that "petitioners have carried the requisite burden of proving sterility due to radiation" but denied compensation on the ground that the disability preexisted the 1959 hearing and did not increase thereafter.
At the time of the 1959 hearing the subject of sterility was not mentioned, and Pino did not undergo sperm tests until July of 1960. The employer urges, and the County Court found, that all the evidence presented by petitioners (other *489 than the sperm tests) showed an awareness of the sterility before the 1959 hearing, and therefore petitioners are precluded by the doctrine of res adjudicata.
A judgment or award is final and conclusive "as to all questions of law and fact thereby determined, including those involving jurisdiction, the right to compensation, and the nature and extent of the existing disability, subject only to the continuing jurisdiction to modify the award of compensation to accord with a subsequently occurring increase or diminishment of the incapacity flowing from the established compensable injury. * * * The statutory review does not contemplate the undoing of what has been finally determined." Tucker v. Frank J. Beltramo, Inc., 117 N.J.L. 72, 79 (Sup. Ct. 1936), affirmed o.b. 118 N.J.L. 301 (E. & A. 1937). "The judgment of the bureau * * * is final and conclusive as to all questions of law and of fact comprehended by the determination * * *," Drake v. C.V. Hill & Co., 117 N.J.L. 290, 292 (E. & A. 1936).
Cirillo v. United Engineers & Constructors, Inc., 121 N.J.L. 511 (E. & A. 1938), does not affect the issues at bar. That case dealt with a disability known at the time of the first hearing. In such case:
"The use of the word `increase' or of the word `decrease' connotes two states of physical condition, one which was and one which is, and there must be knowledge of each state in order to support a conclusion that the present condition marks an increase or a decrease. When once the degree of disability from which a workman suffers at a named time has been judicially determined, then in fairness both to the employer and to the employee the question of increase or decrease in disability must be predicated upon the condition as it was at the hearing out of which the determination emanated." (at pp. 514-515; emphasis added)
The idea of a prior determination was repeated in Yeomans v. Jersey City, 27 N.J. 496, 507 (1958). See also the annotation in 122 A.L.R. 550 (1939).
Here there was no such knowledge. Although Dr. Ibranyi admitted sterility "could have developed on the date of the last treatment or in the middle of it," which dates were *490 prior to the original hearing, he made no sperm test until July 5, 1960. Dr. Rose did a later sperm test at Dr. Ibranyi's request. The fact that petitioner thought, before the first hearing, that the x-ray treatments might be making him sterile, is not conclusive. Cf. N.J.S.A. 34:15-34 which requires a claim to be made within one year "after the employee knew or ought to have known the nature of his disability * * *." Radiation therapy ended April 28, 1958; William was not born until August 11, 1958; the original hearing was held on March 26, 1959. It would have been impossible for Pino to know he was sterile until after William was born and his mother was again capable of conception. Despite any fears he might have had, the first definite evidence of sterility was when Pino received the results of the sperm test done by Dr. Ibranyi, over a year after the 1959 hearing. The County Court, therefore, erred in denying compensation for increased disability, when the disability was not known, was not raised, and was not determined in the earlier hearing.

III.
The employer challenged the dependency of the illegitimate child, William, on the ground that he had been conceived after the accident, citing Wathne v. Midland Construction & Contracting Co., 125 N.J.L. 473 (Sup. Ct. 1940), and Fitzsimmons v. Federal Shipbuilding & Dry Dock Co., 4 N.J. 110 (1950). However, after this case was argued, the Wathne and Fitzsimmons cases were overruled by Close v. Kordulak Bros., supra., which held that "dependency shall be determined as of the time of death rather than the date of accident insofar as the widow and natural children under 18 years actually a part of the employee's household at the time of death are concerned." Since William was a natural child under 18 and actually a part of decedent's household at the time of his death, there can no longer be any question as to his dependency.
The employer challenges the dependency of the legitimate children, Peter and Michael, because they were supported *491 by their stepfather, Mr. Amariera, since 1953, and (except for a short period after the mother's remarriage) decedent contributed nothing since 1953 for their support. Nevertheless, we hold that Peter and Michael were dependents of the decedent within the meaning of the Workmen's Compensation Act.
Decedent was under a legal obligation to support Peter and Michael. In addition, there were outstanding the orders of the courts of New York calling upon him to pay towards their support. Mr. Amariera also may have been liable for their support (Morrow v. Meteor Air Transport, Inc., 14 N.J. Super. 176 (App. Div. 1951)) but his liability was secondary, while decedent's was primary.
In some states, even wives and children are held not to be dependents of the employee unless he actually contributed to their support, but that does not seem to be the law of New Jersey. We seem to adhere to the proposition that a wife is a dependent even if she is living apart from her husband and he is not supporting her, if (1) it was not her fault that she was living apart from him, (2) she did not consent or acquiesce in the separation, (3) she did not assert her complete independence of him, and (4) she asserted her legal dependency upon him. Alexander v. Cunningham Roofing Co., Inc., 124 N.J.L. 390, 397 (Sup. Ct. 1940), affirmed 125 N.J.L. 277 (E. & A. 1940); Koerner v. J.I. Hass Co., Inc., 126 N.J.L. 193 (Sup. Ct. 1941); Jefferson v. Interstate Metals Co., 134 N.J.L. 110 (Sup. Ct. 1946).
In Holden v. Public Service Electric & Gas Co., 127 N.J.L. 405 (Sup. Ct. 1941), the widow was a mental defective who was maintained at public expense in an institution for the insane at the time of the employee's death, and had been so maintained for a number of years. The employer contended that therefore she was not a dependent. The court rejected this contention on the authority of the Alexander and Koerner cases, cited above, and Comparri v. James Readding, Inc., 120 N.J.L. 168 (E. & A. 1938), saying:
*492 "The employer perceives a distinction between the instant case and those cited, in that here the deceased `had been relieved of all dependency and all responsibility for the maintenance' of his wife `by the order of the court, in committing her * * * at the expense' of the county. But there is none in principle. The cited cases have laid it down that dependency in statutory intendment has reference to the duty imposed upon the husband by the law `of fully and wholly maintaining' his wife, and that it `is not governed in the slightest degree by the amount of money actually contributed to or expended upon' the wife, since the husband's failure of duty in this regard `did not render' the wife `any less dependent.' * * * We are not at liberty to interpret the statute differently. The adjudications of other jurisdictions interpreting statutory dependency clauses are of no avail.
And the deceased was not relieved of the obligation of maintenance by the order adverted to. It is not a differentiating circumstance that thereby the court `placed the entire burden' of support upon the county, with no provision for reimbursement by the deceased. The latter's liability for such institutional care and maintenance of his wife remained unimpaired. * * * The husband's obligation in such circumstances is still primary; the county's secondary.
Thus it is that, at the time of the employee's death, his wife was `wholly dependent' upon him within the meaning of the statute." (127 N.J.L., at pp. 407-408)
Since actual support of a wife separated from her husband is not an indispensable prerequisite to make her a dependent under the Workmen's Compensation Act, there appears to us to be even less reason to require it in the case of children who do not live in their father's household. It was not the fault of Peter and Michael that they were living apart from decedent; they cannot be said to have consented to or acquiesced in the separation; they did not assert their complete independence of decedent; and they could not be expected to assert their legal dependency upon him. In case of need, someone else would have had to sue on their behalf, and, as a matter of fact, their mother did obtain the said orders in the courts of New York for support. As was said in Kish v. Chipman Chemical Engineering Co., 7 N.J. Misc. 660, 664 (N.J. Dept. Labor 1929):
"* * * As regards the children, therefore, considering the reasoning of Mr. Justice Black in the Schmid case [Schmid v. Stanton Forging Co., 104 N.J.L. 471 (Sup. Ct. 1928)], the minor children *493 are in every respect dependents on the decedent, as they, who have no will or say in the relations between husband and wife, surely cannot be placed in a position of a wife who voluntarily leaves her husband and maintains a complete independence. Certainly, children, innocent victims of circumstances, are not legally bound by disputes between husband and wife. The children were at all times dependent for food and clothing upon the decedent, and the decedent was at all times obligated by law to support and provide for them."
In Morgan v. Susino Construction Co., 130 N.J.L. 418 (Sup. Ct. 1943), affirmed 131 N.J.L. 329 (E. & A. 1944), the question was the dependency of a posthumous illegitimate child of the deceased employee. The mother of the child never lived in the decedent's household. The court said (at p. 422):
"It is said that the child was not an actual dependent. A child en ventre sa mere is supposed to be born for many purposes. * * * It is not necessary to resort to liberality of construction, as by the statute we may, to conclude that the infant petitioner is comprehended by the section, supra, as a dependent. * * * The decedent would have had the legal and moral duty to support him when born and the child was a dependent  not actual since this is no longer a prerequisite (compare P.L. 1911, chap. 95, p. 139)  but in the broad sense of that term." (Emphasis ours)
See also Cassaro v. Peerless Color Co., Inc., 14 N.J. Misc. 92 (N.J. Dept. Labor 1936).
In some jurisdictions the legal duty to support a child will not establish his dependency upon a father who did not actually contribute to his support. See for example, Roberts v. Whaley, 192 Mich. 133, 158 N.W. 209 (Sup. Ct. 1916), and compare it with Holden, supra. In other states the duty to support is enough to raise, in effect, a rebuttable presumption of dependency. That, we think, is the effect of our cases.
The question comes down to whether the support by the stepfather rebutted the presumption of dependency of Peter and Michael upon decedent. In Kennedy v. Keller, 225 Mo. App. 561, 37 S.W.2d 452 (Ct. App. 1931), children of a deceased employee sought benefits. Their mother had divorced their father four years prior to his death, and had been *494 awarded custody of and support for the children. Decedent paid support monies for eleven months after the divorce and stopped. The mother remarried, and the children lived with and were supported by their stepfather thereafter. The employer argued that since the children were not living with their father at the time of his death, and were therefore not conclusively presumed to be totally dependent upon him for their support, and since the evidence showed he contributed nothing for their support for several years, and the children were therefore not in fact dependent upon him for support, the children failed to prove total or partial dependency. The Missouri statute defined dependent as "a relative * * * who is actually dependent for support, in whole or in part, upon his wages at the time of the injury. * * *" It provided for a conclusive presumption of dependency for children living with the employee, but "* * * In all other cases questions of total or partial dependency shall be determined in accordance with the facts at the time of the injury." The Court affirmed an award for the children, stating (at pp. 453-454 of 37 S.W.2d):
"The word `dependent' ordinarily means the need of aid or support; not self-sustaining. A dependent person is one who has not the means of his own to support himself. A total dependent is one who has no means whatever to support himself. A partial dependent is one who has some means, but not sufficient for his support. The plaintiffs here were obviously totally dependent. They had no means of their own, and were utterly without earning capacity. That such dependency was actual  that is, real  there could hardly be the suggestion of a doubt. Upon whom then were they dependent? Being infants of tender years, they would ordinarily be presumed to be dependent upon their father, upon whom the law imposes the primary duty to support them. Their custody, however, had been awarded to their mother by the divorce decree, and they were receiving their support from their stepfather, but the duty to support them was not imposed upon their mother by the decree, but, on the contrary, was imposed thereby upon their father, so that he was bound to support them as a primary duty, not only by virtue of the law, but by virtue of the decree of the court as well. There can be no question that the support which they received from their stepfather was such as their father was legally bound to provide as a primary duty. If, after having been abandoned by their father, they had been supported by some charitably inclined stranger *495 or neighbor, or by some charitable institution, or by the state, would the courts hold that they were therefore not dependent upon their father for their support, and not entitled, upon his death, to the death benefit provided by the statute? We cannot bring ourselves to believe that the Legislature so intended. Yet this is precisely what the defendants' construction of the statute leads to. Manifestly plaintiffs were, under the conceded facts, totally dependent for their support upon their father at the time of his death, within the meaning of the statute, and entitled to compensation on that basis. We think this view is supported by the authorities, but it is so obviously in accord with both the letter and spirit of the statute that the citation of authorities ought not be necessary."
Cf. Borgmeier v. Jasper, 67 S.W.2d 791 (Mo. Ct. App. 1934); Holley v. Mississippi Lime Co. of Missouri, 266 S.W.2d 606 (Mo. Sup. Ct. 1954); McGarry v. Industrial Commission of Utah, 64 Utah 592, 232 P. 1090, 39 A.L.R. 306 (Sup. Ct. 1925); Drouin v. Ellis C. Snodgrass Co., 138 Me. 145, 23 A.2d 631 (Sup. Ct. App. 1941); 2 Larson, Workmen's Compensation, § 63.31, p. 110 (1961); 99 C.J.S., Workmen's Compensation, § 141(2), p. 484 (1958); 58 Am. Jur., Workmen's Compensation, § 443, p. 862 (1948).
For the foregoing reasons, the judgment of the County Court is reversed and that of the Division of Compensation reinstated.